**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW DAVITT, Individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| UBS FINANCIAL SERVICES INC., | |
| Defendant. | |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ...........................................................................3

III.  PARTIES ...............................................................................................................4

    A.    Plaintiff ......................................................................................................4

    B.    Defendant ...................................................................................................4

    C.    Relevant Non-Parties .................................................................................4

IV.   FACTUAL BACKGROUND .................................................................................4

    A.    UBS's Customer Relationship ...................................................................4

    B.    The Bank Sweep Program .........................................................................5

    C.    UBS Acted as a "Double Agent" Regarding the Bank Sweep Program .............6

    D.    The Bank Sweep Program Primarily Benefits UBS and Its
        Affiliated Banks, Not Its Customers ..........................................................7

    E.    UBS's Disclosures to Its Customers Regarding the Bank Sweep Program
        Contained Material Misrepresentations and Omissions .................................8

V.    CLASS ACTION ALLEGATIONS .....................................................................11

    A.    Numerosity - Rule 23(a)(1) .....................................................................11

    B.    Existence and Predominance of Common Questions of Law
        and Fact - Rule 23(a)(2), 23(b)(3) ...........................................................12

    C.    Typicality - Rule 23(a)(3) .......................................................................12

    D.    Adequacy of Representation - Rule 23(a)(4) ...........................................13

    E.    Superiority - Rule 23(b)(3) ......................................................................13

VI.   CAUSES OF ACTION .........................................................................................14

    FIRST CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY
    (Asserted on behalf of the Plaintiff and the Class against Defendant) ...........................14

    SECOND CAUSE OF ACTION  GROSS NEGLIGENCE
    (Asserted on behalf of the Plaintiff and the Class against Defendant) ...........................16

i

THIRD CAUSE OF ACTION  UNJUST ENRICHMENT (IN THE ALTERNATIVE)
(Asserted on behalf of the Plaintiff and the Class against Defendant) ...........................17

FOURTH CAUSE OF ACTION  NEW YORK GENERAL BUSINESS LAW
(Asserted on behalf of the Plaintiff and the Class against Defendant) ...........................18

VII.    PRAYER FOR RELIEF ...............................................................................................20

VIII.   DEMAND FOR JURY TRIAL ....................................................................................20

Plaintiff Andrew Davitt ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action as a class action against defendant UBS Financial Services Inc. ("UBS" or "Defendant") a wholly-owned broker-dealer subsidiary of non-party UBS Group AG. Plaintiff and the members of the proposed class were at all relevant times customers of Defendant, a full-service broker-dealer and investment advisor, whose cash held in its customers' brokerage accounts was subject to Defendant's bank sweep program, as described below. Plaintiff alleges as follows against Defendant, based on personal knowledge as to Plaintiff and his own acts, and otherwise on information and belief, based on the investigation of his counsel, which included a review of documents created and distributed by Defendant, filings with the U.S. Securities and Exchange Commission ("SEC"), filings with the Federal Deposit Insurance Corporation ("FDIC"), and other publicly available commentary, analysis, and information. Upon information and belief, Plaintiff believes that discovery will further support the allegations in this class action complaint.

## I.    INTRODUCTION

1.    This case arises out of a bank sweep program implemented by Defendant UBS whereby, acting as its customers' agent and fiduciary, UBS automatically "sweeps" uninvested cash balances in its customers' accounts and deposits that cash into deposit accounts at one of its Program Banks.[1]

2.    Defendant implemented the Bank Sweep Program[2] ostensibly to offer UBS's customers an interest-paying vehicle to hold cash that offers FDIC insurance on those cash

---

[1] "Program Banks" refers collectively to UBS Group AG's subsidiary banks, UBS Bank USA ("UBS Bank") and AG Stamford Branch (the "Affiliated Banks"), and the third-party banks that UBS uses for the Program.

[2] The cash sweep programs offered by UBS at issue here are: (i) the UBS Deposit Account Sweep Program (the "Deposit Program"), (ii) the UBS Insured Sweep Program (the "UBS-ISP"), and (iii)

deposits, but in fact, Defendant designed and operated the Program to obtain outsized benefits for itself and its affiliates using its customers' cash, at the expense of Plaintiff and the proposed Class (as defined herein).

3.      UBS specifically acknowledges to its customers that it acts as their "agent" and thus their fiduciary "in establishing," and operating the Program. Under this broad scope of the agency, Defendant exercised its discretion in selecting: (i) the banks to participate in the Program (the previously defined "Program Banks"); (ii) the type of accounts to which the Program applies, and (iii) the type of bank accounts into which the UBS customers' funds are swept. UBS, while acting as its customers' fiduciary regarding the Program, also determines the interest rates paid to its customers under the Program and further decides the amount of compensation to be paid to UBS and/or its affiliates in connection with the Program. Defendant's actions in designing, implementing, and operating the Program to benefit itself at the expense of its customers constitutes a breach of the fiduciary duties that UBS owes to its customers.

4.      While acting as its customers' agent, Defendant UBS used the Program to confer significant benefits upon itself and its affiliates by: (i) taking for itself and its affiliates the vast majority of the compensation earned from its customers' cash at the expense of its customers and principals, who received only a minimal return on their cash deposits; and (ii) concealing the benefits Defendant and its affiliates received from UBS's principals' cash by making inaccurate, misleading, or oblique disclosures.

5.      UBS also failed to adequately, if at all, disclose to its customers that it was an agent serving two masters regarding the Program – those being its customers on one hand, and its

_____

the UBS Business Account Sweep Program (the "Business Program") (collectively, the "Program" or "Bank Sweep Program"). The Program at issue in this case does not include any cash sweep investments in money market funds.

affiliated companies, including the Affiliated Banks, on the other hand. Suffering from this conflict, Defendant shortchanged its customers for the benefit of itself and its affiliates by negotiating with its Affiliated Banks one-sided transactions related to the Program. The Program terms shifted compensation and returns on its customers' cash in the Program from those customers to Defendant or their affiliates. Indeed, while acting as its customers' fiduciary agent vis-à-vis the establishment, maintenance, and operation of the Program, UBS negotiated transactions whereby it shifted the compensation that broker-dealers like UBS customarily receive from banks in connection with cash sweep programs to the Affiliated Banks, instead of to its customers, to whom it owed fiduciary duties. Moreover, UBS failed to disclose these manifestly conflicted transactions, much less obtain informed consent from its customers and principals.

6.     Lastly, Defendant violated its duties to charge reasonable fees on the Program, as required under the applicable industry standards.

7.     Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, gross negligence, unjust enrichment, and violation of New York's General Business Law § 349, and for such other relief as the Court may deem just and proper.

## II.     JURISDICTION AND VENUE

8.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendant, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

9.     The Court has personal jurisdiction over UBS because it has its principal place of business in this District, regularly transacts business in this District, and thus has minimum contacts in New York and in this District.

10.     Venue is proper under 28 U.S.C. § 1391 because, among other things, Defendant has offices in this District, and a substantial part of the events, omissions, and/or relevant conduct by Defendant giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

### A.    Plaintiff

11.     Plaintiff Andrew Davitt was at all relevant times a customer of Defendant and is a resident and citizen of the Commonwealth of Pennsylvania. He maintained accounts with UBS in which cash was held over the course of the life of the account. While he was Defendant's customer, the cash held in his account was automatically "swept" into interest-bearing bank accounts at Program Banks pursuant to the Program.

### B.    Defendant

12.     Defendant UBS Financial Services Inc. ("UBS") is a full-service broker-dealer and investment advisor registered with the SEC. UBS is a wholly-owned subsidiary of non-party UBS Group AG.

### C.    Relevant Non-Parties

13.     Non-Party UBS Group AG is a financial services firm based in Switzerland with operations worldwide. UBS Group AG is a holding company that conducts business through its subsidiaries, including Defendant UBS and non-party UBS Bank USA.

## IV.    FACTUAL BACKGROUND

### A.    UBS's Customer Relationship

14.     The relationship between UBS and its customers, including Plaintiff, was set forth in written agreements such as the UBS Client Relationship Agreement (the "Account Agreement"). The Account Agreement provides that the Bank Sweep Program is governed by the terms and conditions set forth in the Agreements and Disclosures, and the Bank Sweep Program

is also governed by the UBS Bank Sweep Programs Disclosure Statement and the UBS FDIC-Insured Deposit Program Disclosure Statement (collectively, "Program Agreement").

15.     The Program Agreement establishes a fiduciary relationship between Defendant and the proposed class with regard to the Program, stating that "***UBS acts as your agent*** in establishing Deposit Accounts…depositing funds into them and withdrawing funds from them." (Emphasis added).

**B.     The Bank Sweep Program**

16.     The Bank Sweep Program is offered and operated by UBS. The Program Agreement sets forth how customers' uninvested cash is automatically "swept" from the customers' account into deposit accounts with UBS Bank and other Program Banks.

17.     According to the Program Agreement, acting as its customers' agent, UBS will establish two deposit accounts for its customers: a money market deposit account[3] and a linked transaction account.  UBS will, in its discretion, make deposits in and withdrawals from those accounts, determine what balances to keep in each account, and move money between those bank accounts on its customers' behalf as it deems fit.

18.     As defined above, the Bank Sweep Program refers to the three cash sweep programs offered by UBS to retail investors: (i) the Deposit Program, (ii) the UBS-ISP, and (iii) the Business Program. Each of these cash sweep programs pays the same interest rates.

---

[3] A money market deposit account is a type of savings deposit bank account and bears no relation to a money market fund.

19.     In an apparent acknowledgement that the interest rates paid to customers in the Program were not reasonable, UBS recently raised the interest rates on its cash sweep program; a move that cost UBS $50 million in annual profit.[4]

### C.     UBS Acted as a "Double Agent" Regarding the Bank Sweep Program

20.     Pursuant to the Program Agreement, UBS acted as its customers' agent and exercised discretion in the operation of the Bank Sweep Program.

21.     The Program Agreement specifically provided that: "Under the Bank Sweep Programs, ***UBS acts as your agent*** in establishing Deposit Accounts at [UBS Bank], AG Stamford Branch and the Program Banks and depositing funds into them and withdrawing funds from them." (Emphasis added).

22.     Thus, in light of the express terms of the Program Agreement, the scope of the agency extended beyond simply processing payments, and UBS was duty-bound to establish and operate the Program in the best interests of its principals, i.e., its customers such as Plaintiff and the members of the proposed Class. Notwithstanding that legal obligation, UBS established, maintained, and operated the Program for its own interests, contrary to the interests of its customers.

23.     Given the discretion that Defendant exercises over the Program in light of, among other things, the Program Agreement, UBS should have exercised its discretion to benefit its customers, whose agent it was as to the Program, but instead did so to benefit itself and its affiliates. At the same time UBS was acting as its customers' agent in connection with the Program, it was also beholden to its Affiliated Banks and passed significant benefits to those banks.

---

[4] *UBS to Take $50 million Annual Earnings Hit as it Raises Rates on Cash Sweeps*, AdvisorHub (Aug. 14, 2024) available at https://www.advisorhub.com/ubs-to-take-50-million-annual-earnings-hit-as-it-raises-rates-on-cash-sweeps/.

**D.    The Bank Sweep Program Primarily Benefits UBS and Its Affiliated Banks, Not Its Customers**

24.    In contravention of the applicable agreements (including the Account Agreement and Program Agreement) and its fiduciary obligations, the Bank Sweep Program primarily benefits UBS and its Affiliated Banks at the expense of their customers.

25.    According to the Program Agreement, "[t]he Program Banks will pay UBS a fee based upon a percentage of the average daily deposit balance in your Deposit Accounts at each Program Bank."  The Program Agreement describes that, "[a]ll Banks, except [UBS Bank], will pay UBS a fee equal to a percentage of the average daily deposit balance in your Deposit Accounts at the Bank. The fee may vary from Bank to Bank and ***may be as much as 5.00% annually*** on some of the Deposit Accounts." (Emphasis added).

26.    The Program Agreement further states, in vague language, that, "UBS, [UBS Bank] and AG Stamford Branch will also each receive certain additional benefits in connection with the Bank Sweep Programs."

27.    Additionally, the Program Agreement states that, "UBS receives, to the extent permitted by applicable law, an annual fee of up to $50 from both [UBS Bank] and AG Stamford Branch, for each Securities Account that sweeps through the Bank Sweep Programs into Deposit Accounts at [UBS Bank] and AG Stamford Branch, respectively."

28.    The Program Agreement vaguely describes how the Affiliated Banks will benefit from the Program: "[UBS Bank] and AG Stamford Branch will seek to make a profit by achieving a positive "'spread,' or difference, between (a) the sum of the amount of interest that it pays for deposits, and (b) the sum of the amount of interest that it charges for loans and the return on investments made with any deposits that it does not need to fund loans."

29.     UBS's financial advisors also benefit from the Program by "receiv[ing] monthly production credits of 10bps on all eligible average daily cash balances in sweep programs, UBS Bank USA Core Savings and money market funds, if the client relationship meets certain monthly qualification criteria."

30.     As its customers' agent, UBS exercises discretion as to the Program's key features, including negotiating and establishing the rates of returns for its customers, and what it keeps for itself. Notably, when discussing the "Fees to UBS," the Program Agreement reveals that "[i]n its discretion, UBS may reduce its fee and may vary the amount of reductions among clients."

31.     UBS exercised this discretion in a manner that pays unreasonably low returns to its customers in the Program. UBS also shifts to its Affiliated Banks, a substantial portion of the beneficial returns on its customers' cash.

32.     UBS is a fiduciary of its customers in the Program, and in that capacity was required to put their customers' interests first – not the interests of Defendant and the Affiliated Banks. Instead, UBS's customers receive unreasonably low interest rates under the Program.

**E.    UBS's Disclosures to Its Customers Regarding the Bank Sweep Program Contained Material Misrepresentations and Omissions**

33.     In connection with the Bank Sweep Program, UBS made certain disclosures to Plaintiff and the proposed Class, including in the Agreements and Disclosures, the UBS Bank Sweep Programs Disclosure Statement, and the UBS FDIC-Insured Deposit Program Disclosure Statement. UBS's disclosures contained a multitude of material misrepresentations and omissions that inaccurately presented the terms and operation of the Program to Plaintiff and members of the proposed Class, and thus prevented them from giving informed consent as to the Program and UBS's conflicts of interests.

34.    For example, pursuant to the Program Agreement, "[t]he interest on the Deposit Accounts may be higher or lower than the interest rates available to depositors making deposits directly with [UBS Bank], AG Stamford Branch, the Program Banks or other depository institutions in comparable accounts." This statement is false and misleading because, as Defendant knew at the time, the interest rate received by customers in the Program would be lower than the interest rates available to depositors in other deposit accounts.

35.    The Program Agreement states that "[i]nterest rates will be established periodically based on prevailing business and economic conditions, as well as the nature and scope of your relationship with us." This statement was misleading by claiming that the interest rates paid to customers is a function of business and economic conditions. In fact, the interest rates UBS credited to its customers under the Program were set by UBS, were significantly below market rates, and are not reasonably tied to any business or economic condition.

36.    Additionally, UBS's disclosures in the Program Agreement are insufficient regarding how UBS makes money on the "'spread,' or difference, between (a) the sum of the amount of interest that it pays for deposits, and (b) the sum of the amount of interest that it charges for loans and the return on investments made with any deposits that it does not need to fund loans." The Program Agreement vaguely addresses that the "profitability of [UBS Bank] and AG Stamford Branch is determined largely by the difference between the interest paid and the costs associated with its deposits, and the interest or other income earned on its loans, investments and other assets." These vague, inadequate and misleading disclosures do not provide the customer with any insight into the size of the spread or how that impacts the Program's interest rates.

37.    The "spread" referenced by the Program Agreement included not just a typical bank spread, but also compensation – in an amount unknown to UBS's customers – that UBS would have been customarily entitled to receive, but which it chose to forego. Despite the fiduciary duty

UBS owed to its customers and the agency relationship it had vis-à-vis its customers under the Program, UBS chose to forego its compensation *in favor of the Affiliated Banks*, as opposed to its customers. Unlike in an arm's length relationship with a third-party bank that is simply a borrower of its depositor's money, the customers here had a fiduciary relationship with Defendant, who acted as their agent in negotiating and structuring cash sweep-related deals with the Affiliated Banks, but shifted to those banks a portion of the compensation that broker-dealers like UBS typically receive from banks for directing customer cash sweeps to such banks. The amount of the benefit conferred by the customers' agent, UBS, to the customers' counterparties the Affiliated Banks, and indeed the existence of such benefit, were material facts that should have been disclosed by UBS to their customers. In fact, the Program Agreement was entirely silent about what UBS and its affiliates will earn under the Program vis-à-vis its fiduciary customers.

38.     Notably, UBS failed to disclose in the Program Agreement the interest rates that the Program offered, instead only including a link to its website.

39.     There was also no disclosure in the Program Agreement as to the amount that the Affiliated Banks pay UBS.

40.     Unbeknownst to customers in the Program, their agent, UBS, enabled the Affiliated Banks to function as highly profitable arbitrage operations as to the UBS customers' cash in the Program, taking advantage of the nearly free cash funneled to them by UBS as agent of its customers pursuant to the Program, and retaining for themselves the vast majority of the profits they generate with that cash.

41.     Additionally, UBS's disclosures omitted the fact that that UBS negotiated and entered into transactions regarding the Program that directly impacted Plaintiff and the proposed Class, and did so while conflicted, putting its interests and the interests of its Affiliated Banks before the interests of its customers. UBS's disclosures further omitted that UBS foregoes

substantial compensation in connection with the Program so as to benefit its Affiliated Banks, instead of its customers to whom UBS owes a fiduciary duty in connection with the Program.

## V.    CLASS ACTION ALLEGATIONS

42.    Plaintiff realleges and incorporates by reference the allegations set forth above.

43.    Plaintiff brings this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of: All persons who held cash positions in accounts custodied by Defendant, and whose cash was subject to Defendant's Program.

44.    Excluded from the Class are governmental entities, institutional and other non-retail investors; Defendant and any of its affiliates, legal representatives, employs, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class, including other attorneys and staff at each respective firm.

45.    Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

46.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### A.    Numerosity - Rule 23(a)(1)

47.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. However, Defendant oversees approximately $3.1 trillion in client assets through the work of more than 8,900 financial advisors worldwide, and Plaintiff believes that the members of the proposed Class number in the thousands. Accordingly, Plaintiff and the Class satisfy the numerosity

requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**B.     Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)**

48.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

a.     Defendant owed fiduciary duties to Plaintiff and the putative Class members in connection with the Program;

b.     Defendant breached their duties to Plaintiff and the putative Class members in establishing, maintaining, and/or operating the Program;

c.     Defendant's disclosures about the Program contained material misrepresentations or omissions;

d.     Defendant were unjustly enriched by their wrongful conduct;

e.     this case may be maintained as a class action under Fed. R. Civ. P. 23;

f.     and to what extent Class members are entitled to damages and other monetary relief; and

g.     and to what extent Class members are entitled to attorneys' fees and costs.

**C.     Typicality - Rule 23(a)(3)**

49.     Plaintiff's claims are typical of the claims of the Class because he was a customer of UBS that had his cash balances improperly managed through its administration of the Program. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise

from the same course of conduct by Defendant, and the relief sought within the Class is common to the members of each.

**D.    Adequacy of Representation - Rule 23(a)(4)**

50.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

**E.    Superiority - Rule 23(b)(3)**

51.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

52.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

53.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

b.      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.      Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI.   CAUSES OF ACTION

### <u>FIRST CAUSE OF ACTION</u>

**BREACH OF FIDUCIARY DUTY**
**(Asserted on behalf of the Plaintiff and the Class against Defendant)**

54.      Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

55.      At all relevant times, Defendant owed fiduciary duties to Plaintiff and the members of the Class in connection with the Program. Such duties independently arose out of (1) the agency relationship between defendant UBS, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Program; (2) Defendant's holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Defendant's discretion as to the Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards. As a fiduciary to Plaintiff and the Class, Defendant owed them the highest duties of loyalty, candor, due care, and prudence as to the services they provided to them in connection with establishing, maintaining, and/or operating the Program. Moreover, as a fiduciary, Defendant had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with establishing, maintaining, and/or operating the Program. Lastly, as a fiduciary,

Defendant had a continuing duty to obtain informed consent from Plaintiff and the Class regarding the Program, and specifically make sufficiently detailed disclosures regarding the Program, its role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

56.    Defendant further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Program.

57.    Defendant further owed Plaintiff and the Class the duty to charge reasonable fees for their services related to the Program.

58.    Plaintiff and the Class were fully dependent upon Defendant's ability, skill, knowledge, and goodwill with respect to Defendant's Program.

59.    Defendant owed Plaintiff and the Class similar duties by virtue of its control over Defendant's policies or management regarding the Program.

60.    Defendant breached its fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Program to benefit itself at the expense of its fiduciary customers, making material misrepresentations and omissions regarding the Program, violating its duty of care, and acting in its own – not its customers' – best interest vis-à-vis the Program.

61.    Defendant violated its duty of loyalty by, among other things, putting its interest above that of its fiduciary customers, failing to provide sufficient information to its fiduciary customers regarding material features of the Program to obtain informed consent from them, and not properly disclosing its own and its affiliates' role in, and conflicts of interest arising out of the Program, as more fully shown above.

62.    As a direct and proximate consequence of Defendant's conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial and seek

disgorgement of any undue and unjust gains of Defendant, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION

### GROSS NEGLIGENCE
**(Asserted on behalf of the Plaintiff and the Class against Defendant)**

63.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

64.    Defendant owed Plaintiff and the putative Class, all of whom were their fiduciary customers vis-à-vis the Program, certain duties related to its establishment, maintenance, and operation of the Program.

65.    Those duties arose out of (1) the agency relationship between Defendant UBS, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Program; (2) Defendant's holding and control over beneficial funds that belonged to their customers related to their cash sweep balances; and (3) the applicable industry standards.

66.    Defendant's duties to their customers included establishing, maintaining, and/or operating the Program for the benefit of their customers, not for its own benefit. Moreover, Defendant had a duty to make sufficient disclosures to its customers regarding the Program as needed for those customers to give informed consent regarding the Program.

67.    Defendant owed Plaintiff and the Class similar duties by virtue of its control over Defendant's policies or management with regard to the Program.

68.    Defendant breached its duties by the conduct alleged herein, including by designing, structuring, and/or conducting transactions related to the Program to benefit itself at the expense of its customers, making material misrepresentations and omissions regarding the

Program, violating its duty of care, acting in its own – not its customers' – best interest vis-à-vis the Program.

69.     Defendant was not merely negligent; as more fully shown above, it was grossly negligent because its self-serving conduct showed the want of even scant care and/or was an extreme departure from the ordinary standard of conduct.

70.     Defendant's gross negligence directly and proximately caused harm to Plaintiff and the members of the proposed Class.

## THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT (IN THE ALTERNATIVE)
**(Asserted on behalf of the Plaintiff and the Class against Defendant)**

71.     Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

72.     In the alternative, Defendant has received and retained a benefit from Plaintiff and the members of the proposed Class, and inequity has resulted.

73.     Defendant benefited through its unjust conduct by sweeping available cash balances from its customers' accounts in the Program into bank accounts selected for the benefits they offered to Defendant, not its customers, and retained most of the interest generated by those cash balances.

74.     Plaintiff alleges that it is inequitable for Defendant to retain these benefits.

75.     Plaintiff alleges that because of Defendant's conduct, the amount of their unjust enrichment should be disgorged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### NEW YORK GENERAL BUSINESS LAW
**(Asserted on behalf of the Plaintiff and the Class against Defendant)**

76.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

77.    The agreement between the parties giving rise to this action was deemed to have been made in the State of New York, and Defendant selected New York law as the law applicable to the agreement.

78.    In the state of New York, deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service are unlawful.

79.    The acts and practices of Defendant as alleged herein constitute "deceptive" business acts and practices under GBS § 349(a) as the conduct is misleading in a material way and that plaintiff and the Class have been injured by reason thereof.

80.    Plaintiff alleges that Defendant has, in the course of its business and the course of trade or commerce, undertaken and engaged in unfair business acts and practices under GBS § 349(a) by, among other things, using the Program to generate substantial revenue for itself using its customers' cash and beneficial returns on such cash, while paying its customers only a small fraction of those returns, and concealing from such customers the amounts of those customers' interest that it retained for itself and the fact that those amounts represented the vast majority of such interest. Defendant have further engaged in material misrepresentations and omissions regarding key features of the Program.

81.    The deceptive business acts or practices described herein presented a threat and likelihood of harm and deception to Plaintiff and the members of the proposed Class in that

Defendant systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

82.    As a result of Defendant's misrepresentations and omissions of material facts concerning the Program, Plaintiff and the members of the proposed Class have suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

83.    Had Plaintiff and the members of the proposed Class been aware of Defendant UBS's conduct regarding its customer cash in the Program, Plaintiff and the members of the proposed Class would not have participated in those investment products or would have done so on different terms.

84.    The gravity of harm resulting from Defendant's unfair conduct outweighs any potential utility.

85.    The harm from Defendant's conduct was not reasonably avoidable by Plaintiff and the members of the proposed Class because only Defendant was aware of the true facts concerning the Program, and Defendant did not disclose these facts, or did not sufficiently disclose them.

86.    Plaintiff and the members of the proposed Class have suffered injury in fact and have lost money as a direct and proximate result of Defendant's business acts or practices. Monies lost by Plaintiff and members of the proposed Class include, without limitation, the beneficial returns on cash positions from the Program that defendant UBS improperly withheld from Plaintiff and members of the proposed Class in the form of money as fees for defendant UBS, as set forth above.

87.    Through their unfair conduct, Defendant acquired money that Plaintiff and the members of the proposed Class were entitled to.

88.    Plaintiff and the members of the proposed Class accordingly seek appropriate relief under GBS § 349, including (a) in the alternative, restitution in full and disgorgement of all profits

relating to the above-described unfair business acts or practices, and (b) such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair practices.

89.    Plaintiff, on behalf of himself and the members of the proposed Class also seek reasonable attorneys' fees and costs under applicable law, including GBS § 349(h).

## VII.    PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1.    Actual damages;

2.    Punitive damages;

3.    Injunctive relief prohibiting Defendant from continuing to engage in the conduct alleged herein;

4.    Attorneys' fees and costs of suit;

5.    Prejudgment interest; and

6.    Such other relief as the Court deems just and proper.

## VIII.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

DATED: September 3, 2024               Respectfully submitted,

BERGER MONTAGUE PC

*/s/ Radha Nagamani Raghavan*
Radha Nagamani Raghavan (Bar No. 5753140)
Michael Dell'Angelo
(pro hac vice forthcoming)
Andrew D. Abramowitz
(pro hac vice forthcoming)
Alex B. Heller
(pro hac vice forthcoming)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rraghavan@bm.net

mdellangelo@bm.net
aabramowitz@bm.net
aheller@bm.net

Alan L. Rosca, Esq. (OH 0084100)
(pro hac vice forthcoming)
Jonathan A. Korte, Esq. (FL 126450)
(pro hac vice forthcoming)
ROSCA SCARLATO LLC
2000 Auburn Dr. Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
E-mail: arosca@rscounsel.law
        jkorte@rscounsel.law

Paul J. Scarlato, Esq. (PA 47155)
(pro hac vice forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

*Counsel for Plaintiff and the Proposed Class*

21